676 So.2d 866 (1996)
Brenda R. SANDERS, Plaintiff-Appellant,
v.
Brent GORE, Defendant-Appellee.
No. 95-660.
Court of Appeal of Louisiana, Third Circuit.
July 10, 1996.
Rehearing Denied September 4, 1996.
*868 Robert Elton Arceneaux, Mack E. Barham, New Orleans, Mason L. Oswalt, Rayville, Julia C. Symon, New Orleans, for Brenda R. Sanders.
David Paul Doughty, Rayville, for Brent Gore.
Before DOUCET, C.J., YELVERTON, KNOLL, COOKS, and SAUNDERS, JJ.
KNOLL, Judge.
On September 9, 1994, Brenda Sanders filed suit against Brent Gore, seeking damages for breach of his promise to marry her. On November 4, 1994, Brent Gore filed a peremptory exception of no cause and/or no right of action. The trial court, noting that both parties were married to other persons at the time of the alleged breach, granted defendant's exception. Plaintiff appeals, asserting four assignments of error.

FACTS
The petition of Brenda Sanders alleges the following facts.
In March of 1990, Mrs. Sanders first contacted Mr. Brent Gore, an attorney, concerning a collection matter. Although both Mr. Gore and Mrs. Sanders were married to others at the time, a personal relationship soon developed. In May, 1990, the parties began an adulterous affair that continued until December, 1993.
During the course of the affair, Mr. Gore convinced Mrs. Sanders that he wanted to divorce his wife and marry her. He also convinced her to leave her husband, and in May, 1992, Mrs. Sanders obtained a divorce from her husband of twenty-one years. Mr. Gore represented Mrs. Sanders in the divorce, and she alleges that he was able to obtain a divorce judgment even though she and her husband had not lived separate and apart either prior to or subsequent to the divorce.
In June of 1992, the parties took a trip to Hawaii, where they registered for a promotional tour of time-share condos as "Brent and Brenda Gore." On November 12, 1992, Brent Gore presented an engagement ring to Brenda Sanders and formally asked her to marry him. Ms. Sanders accepted the engagement. The affair continued until December 1993, when Mr. Gore told Ms. Sanders that he was "too weak" to leave his wife. Mr. Gore then told Ms. Sanders that he would not marry her and that their relationship was over.
In September of 1994, Ms. Sanders filed suit for damages arising from their liaison, and from Brent Gore's refusal to leave his wife and marry her. In her petition, plaintiff explicitly details the events leading up to the affair, and recounts their numerous indiscretions. The petition also makes several disparaging remarks about Mr. Gore's marriage, which has survived the affair. Ms. Sanders seeks the recovery of $7,300 in gifts given to the defendant over the course of the relationship. She seeks reimbursement for the costs of remodeling her home, which was refurbished in accord with Mr. Gore's tastes, with a view to becoming their matrimonial domicile. Ms. Sanders also seeks damages for loss of reputation and social standing, mental anguish, humiliation, embarrassment, pain and suffering, loss of financial and emotional support, and the needless break-up of her marriage.
On September 13, 1994, the court issued an order sua sponte, sealing the record and ordering that "[n]o one, party, corporation, person, or legal entity of any nature, regardless of where they are located can publish, distribute, or discuss any of the documents, pleadings or reference to this suit or its contents in any way with anyone pending a hearing on this matter to be heard on the 29th day of September, 1994 at 9:00 o'clock a.m." There were no objections. The record remains sealed to this day.
On November 4, 1994, Brent Gore filed a peremptory exception of no cause and/or no right of action. On November 7, 1994, Brenda Sanders filed a motion to recuse all of the judges in the Seventh Judicial District Court, including the Honorable Leo Boothe. On November 17, 1994, Brenda Sanders filed a First Supplemental and Amending Petition in which she added a claim for intentional infliction of emotional distress, and a request *869 for a jury trial. The judge returned this amended petition unsigned.
On January 25, 1995, the trial court heard argument on the defendant's peremptory exception and plaintiff's request for a jury trial. The trial court granted the defendant's exception of no cause and/or no right of action, denied the plaintiff's request for a jury trial and motion to amend, and ordered the attorney for the plaintiff, Mr. Mason Oswalt, to show cause why he should not be sanctioned for "scandalous" language in the petition, and for filing a meritless suit. On February 16, 1995, the judge imposed a sanction of $1,000 and ordered Mr. Oswalt to write a letter of apology to the defendant's wife. Ms. Sanders attempts to appeal Mr. Oswalt's sanctions.
With added new appeal counsel, Ms. Sanders filed this appeal, and briefs the following assignments of error: 1) The lower court erred in holding that Ms. Sanders stated no cause and/or no right of action against Mr. Gore for breaching his promise to marry her; 2) The lower court erred in denying Ms. Sanders' motion to amend her petition and request for a jury trial; 3) the lower court erred in placing a "gag order" and a "seal" on the record below; and 4) the lower court erred in sanctioning Ms. Sanders' trial attorney for filing his client's verified petition. For the following reasons, we affirm.

PEREMPTORY EXCEPTION TO BREACH OF A PROMISE TO MARRY
The trial court granted Mr. Gore's exception of no cause and/or no right of action. The trial court did not specify whether it granted the exception of no cause of action or the exception of no right of action. These exceptions are distinguishable, and each serves a particular purpose. Although Mr. Gore did not employ the correct terminology in styling this exception, and although such loose pleading is not to be condoned or encouraged, we shall treat the pleading as urging both exceptions. Robinson v. North American Royalties, Inc., 463 So.2d 1384 (La.App. 3 Cir.), judgment amended on other grounds 470 So.2d 112 (La.1985).
The exception of no right of action tests whether the plaintiff has an interest in enforcing or capacity to bring the action. The exception of no cause of action tests whether the law affords a remedy on the facts alleged in the pleading. Only the latter exception is applicable to the case sub judice.
In the recent case of Everything on Wheels Subaru, Inc. v. Subaru South, Inc., 616 So.2d 1234 (La.1993), the Louisiana Supreme Court summarized the relevant jurisprudence with regard to the exception of no cause of action:
The function of an exception of no cause of action is to test the legal sufficiency of the petition by determining whether the law affords a remedy on the facts alleged in the pleading. Darville v. Texaco, Inc., 447 So.2d 473 (La.1984). No evidence may be introduced to support or controvert the objection that the petition fails to state a cause of action. La.Code Civ.Proc. art. 931. Therefore, the court reviews the petition and accepts well pleaded allegations of fact as true, and the issue at the trial of the exception is whether, on the face of the petition, the plaintiff is legally entitled to the relief sought. Hero Lands Co. v. Texaco, Inc., 310 So.2d 93 (La.1975); Kuebler v. Martin, 578 So.2d 113 (La.1991).

Everything on Wheels, supra at 1235.
Ms. Sanders' petition is styled as a breach of a promise to marry. Mr. Gore asserts that the fact that the parties were married at the time of the promise operates as a bar to Ms. Sanders' recovery under the contract.
There is little dispute that Louisiana recognizes an action in contract for breach of a promise to marry. See Glass v. Wiltz, 551 So.2d 32 (La.App. 4 Cir.), writ denied, 552 So.2d 400 (La.1989) and cases cited therein. The action, as recognized in Louisiana, is of a contractual nature. Morgan v. Yarborough, 5 La.Ann. 316 (1850); Smith v. Braun, 37 La.Ann. 225 (1885). It is also not disputed that the nature of the contract to marry may in certain situations give rise to nonpecuniary damages for its breach under La.Civ.Code art. 1998. Nevertheless, whether the fact that the parties were married at the time the *870 promise is made operates to nullify the contract is a res nova issue in Louisiana.
We initially note that La.Civ.Code art. 88 specifically provides that a "married person may not contract another marriage." Ms. Sanders argues that this provision is only intended to prevent actual bigamous contracts of marriage, and that a contrario sensu, it does not apply to "contracts to contract" a marriage. Although we have no doubt as to the policy considerations behind Article 88, we will assume, arguendo, that it does not prohibit contracts to marry as opposed to contracts of marriage.
A brief discussion of the history of the obligation arising from a promise to marry is in order. Ms. Sanders references the ancient Roman tradition of sponsatia [sic] as evidence of the Roman heritage of the action for breach of the promise to marry. Our research indicates that although the sponsalia is in fact the ancient origin of the action recognized in Louisiana, the action for breach of the sponsalia disappeared early in history, and in the classical law, betrothals were no longer obligatory in the civil sense. According to Planiol, the promise to marry could produce no effect, nor did it create any obligation. What remedy there was available under civilian doctrine was to be found under the article which stated "every illicit act whatever of man, that causes damage to another, obliges him by whose fault it happens, to repair it."[1]
As stated by Dr. Harriet S. Daggett, a recognized eminent scholar, the contractual action for breach of a promise of marriage is absent not only in the civil law of France but in all civil law countries. Furthermore, the action, as recognized in Louisiana, has its roots not in the civil law tradition, but in the common law as developed in England in the early 17th century.[2] We therefore find a survey of the common law in this area, although not controlling, relevant to a thorough discussion of the issue.
The contractual nature of the promise of marriage is recognized in the common law. Also recognized, however, is the rule that agreements in derogation of marriage are against public policy. The promise made by Mr. Gore was not merely that he would marry Ms. Sanders, but that he would divorce his wife and marry Ms. Sanders. The dissolution of Mr. Gore's current marriage was a necessary antecedent to him marrying Mrs. Sanders. See La.Civ.Code art. 88.
It is for the foregoing reasons that the common law has universally recognized that promises of marriage, when made by persons already married, are unenforceable. The only exception to this rule arises when one of the parties successfully conceals his or her current marriage from an innocent party. As stated in Corbin on Contracts:
§ 1475. Engagements to Marry by One Already MarriedMarriage Brokerage
It is contrary to public policy and illegal for one who has a living spouse to make an engagement to marry another. Such an agreement is not saved by the fact that the parties to the first marriage are separated and that the new agreement is made expressly conditional on procuring a divorce. A party to such an engagement as this can maintain no action for breach of the promise, even after the divorce has been granted and performance would be lawful.
Corbin on Contracts, § 1475 at p. 619.
The issue is also addressed by 17 C.J.S. § 235, which states:
[A]s a general rule, if the object of, or consideration for, a contract is the divorce of a man and wife, or the facilitation of that result, the agreement is against public policy and void, regardless of whether the contract is supported by other and valid considerations. Under the rule, if a contract tends to facilitate the dissolution of a marriage it is void even though it was not made primarily for that purpose, and even though the contract is by or with a stranger to the marriage relationship.

* * * * * *

*871 Contracts so framed as to have effect only on condition that a divorce between the parties should be granted are generally held illegal, since their object is to interest the party to be benefitted in procuring or permitting a divorce. Thus, a promise to marry made by a man or woman already married, to take effect when he or she has obtained a divorce from his or her present spouse, is illegal and void.
17 C.J.S. § 235, pp. 1094-1097.
Nevertheless, the recognition that contracts in derogation of marriage are void is not confined to the common law. In the volume on obligations in their Cours de Droit Civil Francais, Aubry and Rau state that:
In addition to agreements in which the object of the performance promised by one of the parties is an unlawful act and thus the cause itself becomes illegal with regard to the other party, several other agreements may be mentioned whose cause is illegal: ... promises to dissolve a marriage,...
Aubry & Rau, Droit Civil Francais, Vol. IV, Obligations, § 345, English Translation by the Louisiana State Law Institute, pp. 338-339.
In her brief on this issue, Ms. Sanders argues that "the original common law rationale for Mr. Gore's defense has been undercut by modern views of the state's interest (or lack thereof) in promoting the continued existence of marriage, as reflected by its continued lessening of the burdens of obtaining a divorce." She further states that "[t]here is no longer a public policy, if indeed there ever was one, of preventing couples from divorcing." These statements are sorely misplaced. We find even more bizarre her assertion that "[i]n actuality, statistically, and as a matter of fact, promises of married persons to marry otherseven other married personsis almost as prevalent as, if not more prevalent than, the promise of a single person." While we recognize that divorce is now easier to obtain legally, we also recognize that the institution of marriage is still guarded by public policy provisions.
The State of Louisiana has long recognized the importance to society of the institution of marriage. The family is recognized as the fundamental unit of society. The state, therefore, encourages couples to marry and discourages their divorce. In Succession of Butler, 294 So.2d 512 (La.1974) the Louisiana Supreme Court stated:
The law's attitude toward the marriage relation has been stated as follows: "public policy, good morals, the highest interest of society require that the marriage relations should be surrounded with every safeguard and their severance allowed only for the causes specified by the law, and clearly proven." Halls v. Cartwright, 18 La. Ann. 414 (1866). See also Barringer v. Dauernheim, 127 La. 679, 53 So. 923 (1911). The Civil Code declares that "individuals cannot by their conventions derogate from the force of laws made for the preservation of public order or good morals." La.Civil Code art. 11. See also La.Civil Code art. 1758(1), 1892. In keeping with this policy of the law, every attempt should be made to reconcile estranged couples. Meyer v. Howard, 136 So.2d 805 (La.App.1962). Though stated more than a century ago, the policy remains fundamentally unchanged.
Butler, supra at 514. See also McMahon v. Hardin, 10 La.App. 416, 121 So. 678 (Orl.Cir.1929).
The marriage contract affects not only the parties involved, but also their posterity and the good order of society. Marriage is therefore subject to legislative control, independent of the will of the parties. Rhodes v. Miller, 189 La. 288, 179 So. 430 (La.1938).[3] See also, La.Civ.Code art. 86, comment (c). Under Louisiana Civil Code article 98, married persons owe each other fidelity, support, and assistance. The spouses' duties under this article are matters of public order from which they may not derogate by contract. Holliday v. Holliday, 358 So.2d 618 (La. 1978); La.Civ.Code art. 98, comment (e). The obligations under Article 98 are not *872 merely owed by spouses to each other, but, because they are elements of public order, are owed to society as a whole.
The case sub judice involves not a simple promise to marry, but a promise to dissolve a marriage and marry another. In fact, this lawsuit was triggered by Mr. Gore's statement that he was "too weak" to leave his wife. Therefore, a primary cause of the contract was the dissolution of Mr. Gore's marriage. This cause was definitely known to Ms. Sanders. The contract sought to be enforced in the case sub judice is in direct opposition to Mr. Gore's obligations under La.Civ.Code art. 98.
Our survey of the law on this issue reveals no jurisprudence or commentary which supports the enforcement of a contract of marriage between persons already married. To the contrary, the jurisprudence of our sister states, the commentary of civilian jurists, Louisiana jurisprudence, and the Louisiana Civil Code support the statement that contracts in derogation of marriage are against public policy. We therefore affirm that the promise to marry by persons already married is unenforceable as against public policy.
La.Civ.Code art. 2030 states:
A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral. A contract that is absolutely null may not be confirmed.
Absolutely null contracts are void ab initio, and are treated as if they never existed. Absolute nullity can be raised as a defense even by a party who knew of the defect that makes the contract null. Under the doctrine of nemo propriam turpitudinem allegare potest (no one may invoke his own turpitude), performance rendered under an absolutely null contract may not be recovered by a party who either knew or should have known of the defect that makes the contract null. La.Civ.Code art. 2033. The doctrine was eloquently applied in Boatner v. Yarborough, 12 La.Ann. 249 (1857):
But judicial tribunals should not be called upon to adjust the balance of profit and loss between joint adventures in iniquity.... The law, whose mission is to right the innocent and to enforce the performance of licit obligations only, leaves parties who traffic in forbidden things and then break faith with [each] other to such mutual redress as their own standard of honor may award.
Boatner v. Yarborough, 12 La.Ann. 249 (1857).
This court recognizes that the exception of no cause of action should be sustained only if it is clearly shown that the law affords no remedy for the grievances alleged, under the circumstances alleged, under any theory of the case. Crumling v. Crumling, 628 So.2d 1194 (La.App. 3 Cir.1993). In brief, Ms. Sanders asserts that several theories of recovery, independent of the breach of the promise to marry, apply to the facts alleged in the petition. Although she asserts claims in fraud, detrimental reliance, and abuse of the attorney/client relationship, these causes of action are simply restatements of her action for breach of the marriage promise.
Ms. Sanders asserts that through artifice and fraudulent misrepresentation, Mr. Gore was able to convince her to divorce her husband, renovate her house, and give him expensive gifts. She argues as fraud the fact that he never really intended to leave his wife, and asserts arguments of detrimental reliance. Significantly, however, Mr. Gore never misrepresented to Ms. Sanders that he was married. La.Civ.Code art. 1966 applies to claims of both contract and detrimental reliance and provides that "[a]n obligation cannot exist without a lawful cause." Therefore, an obligation, whether it results from a contract or from detrimental reliance, must have lawful cause. We have already held that the underlying cause for Mr. Gore's promise is against public policy. We also hold that for the same reasons, Ms. Sanders' reliance on that promise is not justified. We therefore find no merit in Ms. Sanders' claim of fraudulently induced detrimental reliance.
Ms. Sanders also alleges an abuse of the attorney/client relationship. Although this court finds Mr. Gore's actions ethically reprehensible, Louisiana law does not prohibit sexual relationships between attorneys and *873 their clients. Also, although Ms. Sanders alleges a conflict of interest in his handling of her divorce, she does not allege that Mr. Gore failed to adequately represent her. Nor is it alleged that Ms. Sanders was unaware of this conflict of interest. In fact, Ms. Sanders specifically alleges in her petition that Mr. Gore told her the reason he wanted her to file for divorce was so that he could marry her. Furthermore, Ms. Sanders does not allege that Mr. Gore's handling of her legal affairs caused her any injury that was independent of her claim for breach of the promise to marry.
For the above reasons, we find that Ms. Sanders failed to state a claim for which the law affords a remedy. Based on Ms. Sanders' allegations, she voluntarily engaged in an illicit affair with a married man who refused to divorce his wife and marry her, and now requests that a court of law award her legal damages for her illicit conduct. Ms. Sanders' position is untenable in law and against public policy. There is no place in the law for romantic fiction for a scorned mistress' adulterous conduct. The law abhors such conduct that defiles a marriage. No matter how the action is styled, the nucleus of operative fact is the same, and the law recognizes no cause of action arising from those facts. The defendant's exception of no cause of action is accordingly affirmed.
Ms. Sanders asserts that she should be allowed to amend her petition in order to assert facts necessary to state a cause of action. Generally, parties are allowed to amend when there is a possibility that a cause of action might be stated; however, the right to amend is not so absolute as to permit the same when such amendment would constitute a vain and useless act. Ustica Enterprises, Inc. v. Costello, 434 So.2d 137 (La. App. 5 Cir.1983). We find that after reading the briefs and hearing the arguments of counsel on this issue, no additional fact could be asserted that would establish a cause of action against appellee.

DENIAL OF MOTION TO AMEND
On November 18, 1994, Ms. Sanders filed a First Supplemental and Amending Petition and a request for a jury trial. In this supplemental petition, Ms. Sanders did not make any new factual allegations, but merely added allegations of negligent and intentional infliction of emotional distress as causes of action. Mr. Gore opposed the amendment of the petition as an attempt to avoid the ten day limit for requesting a jury trial under La.Code Civ.P. art. 1733. The court denied the motion to amend and request for a jury trial. Ms. Sanders assigns as error the trial court's refusal to allow her to amend her petition, and the court's denial of a jury trial.
La.Code Civ.P. art. 1151 allows a plaintiff to amend her petition without leave of court before the answer thereto is served. Nevertheless, the trial court has discretion to disallow amendments to petitions that make no new allegations of fact and are filed solely to circumvent the ten day limit to request a jury trial. Juneau v. Humana, Inc., 95-267 (La.App. 3 Cir. 5/31/95); 657 So.2d 457. Ms. Sanders' amending petition contained no new allegations of fact, and we find that the trial court was within its discretion to disallow the amendment as an attempt to circumvent the rule of La.Code Civ.P. art. 1733. For the same reason, the trial court was correct in denying Ms. Sanders' untimely request for a jury trial.

SEALING THE RECORD
Because of the extremely personal and destructive nature of the allegations of the petition, and the potential for damage to the families and reputations of the parties, who lived in a small rural community, the trial court ordered the record sealed and placed a "gag order" on the parties. At the outset, we note the paradoxical nature of Ms. Sanders' request on appeal to have the contents of the record in this case open to the public. As stated by Professor Harriet Daggett in her essay on the breach of the marriage promise:
The charges of shock, wounded pride, etc., in the case of a plaintiff who didn't need to discuss the seduction phase of the case at all, except for the extra fee that might be in it, seem the height of absurdity. Humiliation, wounded pride and the like are also hard to reconcile with a temperament *874 who will come into court to claim money damages therefor and recount in the most "telling" manner intimate things which could never have been known but for her own public testimony.
Daggett, Legal Essays on Family Law, The Action for Breach of the Marriage Promise, p. 84.
On September 13, 1994, the trial judge ordered the record sealed and placed a gag order on the parties, pending a hearing to be held on September 29, 1994. This hearing was continued and never refixed. Therefore the merits of the issuance of this order have never been addressed in the court below.
La.Code Civ.P. art. 1631 provides the trial court with the power "to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done." Furthermore, under La.Code Civ.P. art. 191, the trial court possesses inherently all of the power necessary for the exercise of its jurisdiction even though not expressly granted by law. This power certainly extends to issuance of protective orders to assure the fair administration of justice under proper circumstances. Economy Carpets Mfrs. & Dist., Inc. v. Better Bus. Bur. Etc, 319 So.2d 783 (La.1975).
The trial court correctly recognized that the dubious chances of recovery based on the petition filed by Ms. Sanders were greatly outweighed by the potential the petition raised for outrageous gossip and scandal. We find the trial court did not exceed its authority in issuing the order complained of, especially since it ordered a hearing on the issue to take place soon thereafter. Matherne v. Hannan, 534 So.2d 991 (La.App. 4 Cir.1988), writ denied 537 So.2d 1169 (La. 1989). Ms. Sanders chose not to avail herself of the hearing at the trial level. Accordingly, the order of the trial court is affirmed.

SANCTION
The petition filed by Ms. Sanders contained numerous "scandalous" statements, which were not particularly relevant to the disposition of the case. Specifically, the petition included unnecessary comments about Mr. Gore's family and his sexual relationship with his wife. These statements reveal the extremely vindictive nature of the petition filed. After a hearing on the issue, the trial court sanctioned Mr. Mason Oswalt, Ms. Sanders' attorney, in the amount of $1,000. Mr. Oswalt was also ordered to write a letter of apology to Mr. Gore's wife. Ms. Sanders appeals the sanction.
We note that it is Ms. Sanders, rather than Mr. Oswalt, who raises the issue of the sanctions on appeal. In a letter from Mr. Oswalt to Judge Leo Boothe, filed into the record in the case sub judice, Mr. Oswalt specifically states that he does not wish to appeal the sanctions:
A meeting was held with Judge Booth [sic] and which time Judge Booth indicated that he would be willing to stipulate to the sanctions. The stipulations were that I would be sanctioned $1000.00 and be required to provide a written apology to Mrs. Jo Lynn Gore for the wording of the initial pleadings. It was also agreed that I would not appeal these sanctions on my behalf and that this would resolve this matter.
* * * * * *
I continue to disagree with the court's decision to impose sanctions on me as attorney for Mrs. Sanders, however I gave Judge Booth my assurance that I would not appeal the sanctions on my behalf and I will abide by my honor. Judge Barham has filed an appeal of the sanctions on behalf of Mrs. Sanders and if my authorization is necessary to appeal this decision on behalf of my client, please consider this correspondence as signed authorization for that appeal and have this letter filed in the record. (Emphasis Added).
Regarding Ms. Sanders' ability to appeal the sanctions imposed upon Mr. Oswalt, we note that La.Code Civ.P. art. 2086 provides for third party appeals only when the third party could have intervened in the trial court. La.Code Civ.P. art. 1091 defines the terms upon which intervention is allowed:
A third person having an interest therein may intervene in a pending action to enforce a right related to or connected with *875 the object of the pending action against one or more of the parties thereto by:
1) Joining with plaintiff in demanding the same or similar relief against the defendant;
2) Uniting with defendant in resisting the plaintiff's demand; or
3) Opposing both plaintiff and defendant.
We find that Ms. Sanders has no interest in the sanctions imposed on Mr. Oswalt in his capacity as an officer of the court, and that she has no right to appeal the judge's decision. The right to appeal the sanctions is personal to Mr. Oswalt and to no other. As an officer of the court, Mr. Oswalt had a duty to conduct himself at all times with decorum, and in a manner consistent with the dignity and authority of the court and the role which he himself should play in the administration of justice. Furthermore, Mr. Oswalt had the duty to treat the court, the opposing counsel, and the opposing party with due respect. La.Code Civ.P. art. 371. It is for breach of this duty that the court imposed the sanctions. As an officer of the court, Mr. Oswalt should have known the consequences of the insertion of needless, spiteful, and inflammatory allegations in the meritless petition he submitted. It is for this breach of professional conduct that Mr. Oswalt was sanctioned, and we find, therefore, that Ms. Sanders has no interest in the matter. This assignment of error is without merit as it is improperly before this court.
We also note the provisions of La.Code Civ.P. art. 2085, which provides:
An appeal cannot be taken by a party who confessed judgment in the proceedings in the trial court or who voluntarily and unconditionally acquiesced in a judgment rendered against him.
There is no question that Mr. Oswalt voluntarily and unconditionally acquiesced in the judgment rendered against him. His letter, filed in the record, reflects that the sanctions were stipulated to, and that although he disagreed with their imposition, he would not contest them on appeal. Mr. Oswalt fully complied with the stipulation. We find that this assignment of error is improperly before this court.
Nevertheless, assuming arguendo, that the issue of sanctions was properly before this court on appeal, we find that the trial court was well within its authority in levying sanctions based on the egregious language of the petition filed by Mr. Oswalt, a petition which states no cause of action in law.
According to La.Code Civ.P. art. 863, pleadings are not to be interposed for any improper purpose, such as to harass. Attorneys signing such pleadings may be sanctioned in a manner the court deems appropriate, including the assessment of fees and penalties. Furthermore, La.Code Civ.P. art. 864 provides that for the insertion of scandalous or indecent matter in a pleading, an attorney may be subjected to appropriate disciplinary action. We find that the trial court did not abuse its discretion in ordering sanctions and a letter of apology.

CONCLUSION
We hold that the institution of marriage demands full respect from the law, therefore, as a matter of public policy, agreements to marry by persons already married are absolutely null. The judgment of the trial court is affirmed. All costs of this appeal are assessed to plaintiff-appellant.
AFFIRMED.
DOUCET, C.J., concurs in the result.
YELVERTON, J., concurs in part and dissents in part and assigns written reasons.
COOKS, J., dissents and assigns written reasons.
YELVERTON, Judge, concurring and dissenting.
I concur with the holding that agreements to marry by persons already married are against public policy. But the arguments in favor of a cause of action are by no means groundless. While I believe we should affirm the ruling on the exception, I am of the opinion we should set aside the ruling sanctioning Mrs. Sanders' attorney. Filing this suit was not a sanctionable offense. I want to explain my positions on these two rulings.
*876 One explanation for why damages historically have not been recoverable based on a breach by a married promisor is found in the concept of the indissolubility of marriage, a concept which made it impossible for a married promisor to carry out the promise while his or her spouse was still living. This was the influence of the Catholic Church on the civil law of European and other countries, and on the English law until King Henry VIII. Since the twelfth century, indissolubility has been one of the two essential properties of marriage according to the Catholic Code of Canon Law. The ancient Roman marriage was intrinsically dissoluble simply by the withdrawal of consent by a spouse. Canon Law regards a valid marriage as indissoluble. Civil divorce is recognized but it does not dissolve the marriage union so long as both parties are living. The marriage being indissoluble, a subsequent marriage is not only forbidden, but it would also be invalid. Comment to Canon 1056, The Code of Canon Law: A Text and Commentary, Trans. James A. Coriden, Thomas J. Green, Donald E. Heintchel, Paulist Press, 1985. In ecclesiastical terms, remarriage would be the equivalent of the crime of bigamy. When remarriage is utterly impossible, a promise to marry made by a married person cannot be fulfilled, and one would never be justified in relying on such a promise.
By Justinian's time, a thousand years after the Twelve Tables, the ancient Roman marriage and divorce laws were already being changed by the Catholic Church. By the sixteenth century, after another thousand years had passed, divorce had ceased to exist in those countries where the church was dominant. Divorce returned to England with the English Reformation under King Henry VIII. It arrived much later in civilian jurisdictions influenced strongly by the church. For example, in France it was permitted briefly following the French Revolution, disappeared in 1814, and was not reestablished until 1884. It was not until 1932 that divorce was recognized by the law of Spain; only as recently as 1970 in Italy; and it is still not recognized in the Phillippines.
Plainol believed that the institution of divorce was inimical to the institution of marriage. In his treatise published nearly 60 years ago in 1939, he said "[M]odern legislations, reacting against the Catholic principle of the absolute indissolubility of marriage, returned to divorce...." 1 M. Planiol, Treatise on the Civil Law, § 1147, p. 639 (La.St. L.Inst.Trans.1959). He deplored the increase in divorce, but noted the still great difference between a divorce by modern legislations and the Roman Law: modern legislations recognizing divorce only for specified causes, and Roman Law permitting divorce contingent solely upon the will of the spouses. § 1147, p. 639. Planiol wrote:
Divorce, it is said, shatters the standing of marriage. It is dangerous to make the conjugal bond too fragile. Marriages are contracted with a light heart, if the couple feel that there is a way out. Were marriage indissoluble a couple would think twice before marrying.
The objection [that divorce shatters the standing of marriage] is decisive when divorce is permitted, at pleasure, as it was the divorce of the Romans.
§ 1143, p. 635. "[W]hen the principle [divorce] is admitted there seems to be no check upon its application." § 1145, p. 635. It was his concern that "Many persons marry thoughtlessly, saying: `If it does not work out, there will be a divorce.'" § 1146, p. 637.
The idea of the indissolubility of marriage has disappeared in the civil law of Louisiana. Even the word is gone. Whereas former La.Civ.Code art. 136 used "dissolved," its current counterpart, La.Civ.Code art. 101, uses "terminates." Marriage is by definition a legal relationship between a man and a woman that is created by civil contract. La. Civ.Code art. 86. The 1987 revision comments emphasize that the policy of the law is to view marriage as "purely a civil matter, and not as one subject to religious or ecclesiastical law." It is the same in Louisiana as in Planiol's France, a matter of separation of church and state. The civil contract of marriage requires a marriage ceremony and free consent. La.Civ.Code art. 87. But the civil law does not requirealthough by the traditional ceremonial vows the parties usually agreethat the marriage will exist until the bond is severed by death. La.Civ.Code *877 art. 101 provides that one of the means of terminating marriage is divorce.
Today, divorce is common and easy to get. Divorce in the United States in 1995 was sixteen times as high as it was in 1867, the first year that divorce figures were published. The divorce rate is now half the marriage rate. Broderick, Marriage, World Book Encyclopedia, 1995 ed., The World Book Multimedia Encyclopedia, CD-ROM version.
A promise of marriage by a married person under today's civil law is a promise that can be kept. This is because a civil marriage contract is terminable by divorce on no-fault grounds. Not only has the concept of indissolubility of marriage disappeared in Louisiana law, but a person now can get a divorce without having to prove fault on the part of his or her spouse.
Whether the alleged agreement in this case between Mr. Gore and Mrs. Sanders violates public policy is debatable, considering realities. What makes it bad is not their agreement to marry each other, but that, on the way to carrying out that agreement, they must step over the graves of two other marriages, his and hers. Nevertheless, it is not a crime, nor is it illicit or unlawful, to get a divorce. Bigamy is a crime, but it does not become a crime until the person remarries while still married to another. There is no such thing as a bigamous promise to marry. It lay in the power of each of the promisors to unilaterally keep the promise.
Divorce is almost as easy to get in Louisiana today as it was in ancient Roman times. Although certain legal formalities are required, a divorce is now obtainable based solely on living separate and apart for 180 days. There have been other changes in rules that once existed for the protection of marriage. Former La.Civ.Code art. 161, which for 102 years in Louisiana forbade the marriage of a divorced adulterer with his or her accomplice in adultery, under penalty of being considered and prosecuted as guilty of the crime of bigamy, was repealed in 1972. The State has no interest in forcing one married person to stay married to one to whom he or she does not want to be married, and "it is doubtful that forcing them to remain married would be conducive to the family concept." Thomason v. Thomason, 355 So.2d 908, 910 (La.1978). Contracts with concubines are no longer against public policy. There is no public policy impediment to a married paramour and a concubine acquiring real property as co-vendees. LeDoux v. LeDoux, 534 So.2d 103 (La.App. 3 Cir.1988). K. Spaht and L. Hargrave, Matrimonial Regimes § 8.3, at 369, in 16 Louisiana Civil Law Treatise (1989), said "[T]he state has made divorce so easy that it may be unrealistic to consider marriage to be more stable than concubinage; indeed, the state has virtually abandoned its policy of encouraging only long-term stable marriages." In Succession of Butler, 294 So.2d 512, 514 (La.1974), the court was still hoping that "every attempt should be made to reconcile estranged couples." The ideal remains the same, but in today's divorce court a judge who tries to dissuade a person from obtaining a divorce is all too often considered as meddling in an affair that is none of his business. In assessing public policy, the recent changes in attitude toward marriage and divorce cannot be ignored.
The majority opinion relies on old authorities. Planiol was published in 1939; Aubry & Rau in 1942; Dr. Daggett wrote in 1935. There is a quotation from a Louisiana decision in 1857. Divorce was much less frequent then. The religious principle of indissolubility had considerable influence and divorce, even when available, was fault-based and therefore not controllable by the will of one spouse. The institution of marriage is not the same today as it was then. But we still hold high the banner of marriage and the family. The 1996 Louisiana Legislature, by House Concurrent Resolution No. 124, recognized that through our laws and in civilian theory "the institution of marriage is one that sustains order and morality in our communities and preserves the posterity and well-being of our larger society...." This is a statement of public policy.
As much as we honor the institution of marriage, it would seem that we should equally condemn divorce, for divorce is the enemy of marriage. But in the current civil law divorce is a lawful and publicly accepted *878 means of terminating marriage. It cannot be said that divorce is against public policy. And people nowadays do get divorced for the purpose of marrying somebody else. We allow damages for breach of agreements to marry between unmarried persons. If plans are made by two married persons who are not married to each other, but want to be, and one is damaged by the breach of such an agreement, redress is not totally unthinkable. Considering the current attitude toward divorce, there is something to be said for Mrs. Sanders' case. By finding no cause of action, we punish Mrs. Sanders, who winds up pecuniarily damaged (we must not forget that the case is before us on an exception of no cause of action and, by law, we must regard the allegations as true), while we reward Mr. Gore with immunity. In a recent New York case, Witkowski v. Blaskiewicz, 162 Misc.2d 66, 615 N.Y.S.2d 640 (1994), the court ruled that a party to an agreement to marry could recover an engagement ring from the breaching promisor even though the promisor was married and an impediment existed to the marriage. The reasoning of the court was that two adults, aware of their current marital situations, were nevertheless capable of making decisions about their future status, and to give effect to an impediment to the marriage would punish the gift giver and reward a party who may not at all be innocent. It is arguable that nothing is really accomplished for the protection of the institution of marriage by closing the doors of the courts to Mrs. Sanders on an exception of no cause of action. One marriage, hers, has already been destroyed. The questions can be asked, what example do we set by this ruling, and who benefits by the example? What message do we send, and to whom?
Nevertheless, difficult as these questions are, I believe that the rule that the institution of marriage must be protected transcends individual freedom of contract. "[T]he whole question amounts to knowing which among the rules that form our private legal system are by their nature and purpose placed above private autonomous dispositions, so that they cannot be subject to a free regulation of interests or at least govern the latter to some extent to prevent that superior interest to be dominated by individual will." F. Gény, Method of Interpretation and Sources of Private Positive Law, No. 175, p. 423 (La.St.L.Inst.Trans.1963). While divorce inflicts the ultimate damage on marriage, it somehow seems more threatening to the institution when it is the result of carrying out the terms of a contract with someone who is not a party to the marriage. However free a person may be to terminate, unilaterally, his or her own marriage, it is something else when a third person steps in and, after making the termination of another's marriage the subject of a contract, wants damages for the breach of it. For these reasons I agree that public policy bars a cause of action for damages in this case.
This brings me to the issue of sanctions against Mr. Oswalt, the plaintiff's attorney. I cannot agree that the mere filing of this suit was a sanctionable offense. Whether there is such a cause of action is res nova and, as I have tried in my concurring opinion to demonstrate, the res has two sides. The question of sanctions is before us, and we should reverse the judgment of sanctions.
I agree that we cannot reverse the $1,000 fine or the "letter of regrets" to Mrs. Gore. Mr. Oswalt has paid the fine and written the letter, and he agreed not to appeal either requirement. But he has never agreed that what he did was sanctionable conduct. He has protested that from the start. Mrs. Sanders has an interest in appealing. She verified the petition and La.Code Civ.P. art. 863(B) applies equally to her. The finding that her lawyer's filing of the suit was sanctionable is inferentially a finding that she was also guilty of a sanctionable offense in filing the suit.
At the January 25, 1995 hearing on the exception of no cause of action the trial court on its own motion orally cited Mr. Oswalt for sanctions saying, "[T]here were allegations in the petition that disturbs [sic] this court." The trial court gave two reasons for the citation: "the scandalous nature of the language in the petition" and the lack of merit in the suit. The sanctions hearing was conducted on February 16, 1995. The only evidence before the court was the petition. The entire proceeding is set forth as follows:

*879 COURT: Okay.(Docket being sounded.)We'll take up the Sanders/Gore matter. That shouldn't take but a minute. Okay, Mr. Oswalt.
OSWALT: Yes sir. Judge, I'm just here on behalf of you asking me to come in for sanctions. And I'm here to submit to the Court.
COURT: Okay, do you have a statement to make or any ...
OSWALT: I'd just like for Your Honor to know I didn't do anything intentional to embarrass anybody or humiliate anyone in this case. I understand that pleadings have been filed and you know what they say.
COURT: Uh huh.
OSWALT: So I'm just going to submit to the Court. Whatever he feels.
COURT: All right. The Court ... the Court, of course, was very disappointed in the pleadings and ... but your conduct otherwise in this case has been fairly exemplary. I've not ... I've not noticed any discourteous behavior or any ... any attitude of ... that was reflected in the pleadings. The Court was somewhat astounded at the pleadings. They're not typical type pleadings that ... and this Court cannot tolerate those kind of pleadings in this Court. And, the Court is aware of the circumstances behind, ... unofficially, how... how those pleadings got to be signed by you. And I'm taking that into cognizance without elaborating any further. But I want the record to reflect and I want it to be known in legal circles that this Court will not tolerate such language and that type of pleading in this Court. And, as I said, your conduct that I've observed during your handling of the case and in my presence has been exemplary. And the only ... only problem I have is with the pleadings. And, I'm going to sanction you, fine you one thousand dollars ($1,000), and order you to submit a letter of regrets to spouse of the Defendant.
OSWALT: I'll prepare a Judgment to that effect, Your Honor.
COURT: All right. All right, Mr. Oswalt.
OSWALT: Okay. Would you like to see me in Chambers?
COURT: Yes, I'd like ... we'll have a private discussion with you.
END OF TRANSCRIPT.
The subject matter of the litigation was breach of a promise to marry and damages caused by the breach. What was before the trial court was a petition containing a statement of the material facts of the transaction or occurrence that was the subject matter of the litigation. La.Code Civ.P. art. 891. In this litigation the only standard by which we can consider the petition is the exception of no cause of action. We have to accept the allegations of fact as true to evaluate the exception of no cause of action. At the hearing on that exception, no evidence was admitted and none was admissible. The trial judge heard no evidence at the sanction hearing either.
When Mr. Oswalt signed the petition he certified, according to La.Code Civ.P. art. 863(B), "that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact; that it is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." There was no evidence at the sanctions hearing (or anywhere else in the record) that the petition was not well grounded in fact. As I have tried to show, certainly a good faith argument has been made for the extension of existing law to allow a suit for damages for breach of a promise to marry made by a married person, just as the law already recognizes that such a suit is permissible based upon breach of a promise made by an unmarried person. There is no evidence in this record that the suit was interposed for any improper purpose. If an improper purpose can be found, the only place it can be found is in the petition itself, because the petition was the only evidence before the court. The trial judge did not find that the suit was filed for any improper purpose, and it is hard for me to find in an objective interpretation of the pleadings that *880 the purpose was for anything other than damages for breach of promise.
The sanctions law, La.Code Civ.P. art. 863, is intended only for exceptional circumstances. It does not empower a district court to impose sanctions on lawyers simply because a legal argument or ground for relief is found to be unjustified. Failure to prevail does not trigger a sanctions award. The slightest justification for the exercise of a legal right precludes sanctions. Murphy v. Boeing Petroleum Services, 600 So.2d 823 (La.App. 3 Cir.1992).
No matter how unpleasant was the nature of the conduct that was recited by the pleadings, in the context of an exception of no cause of action the allegations could not be scandalous unless they were irrelevant. No allegation was irrelevant. Every allegation in the petition was relevant to the subject matter of the litigation. The majority opinion does a good job of essentially covering the allegations. Only with the reference to the part about Mr. Gore's marriage do I disagree. The allegations about Mr. Gore's marriage were attributed to Mr. Gore; they were not assertions of fact by the pleader. They were relevant allegations.
According to Webster's Ninth New Collegiate Dictionary "scandalous" has two synonymous cross-reference meanings: "1: LIBELOUS, DEFAMATORY 2: offensive to propriety or morality: SHOCKING." We can hardly find that the petition qualifies as scandalous under the first definition when we are limited to its evaluation on an exception of no cause of action. Truth is a defense to libel and slander. Applying the second definition, I must respectfully say that I can find nothing in the petition that is shocking. Not one word. The worst words I could find were "seduced," "intimate sexual relationship," "sexual intercourse," and "sex."
This petition is a fact pleading, maybe not at its best but certainly not at its worst. The petition is not even unnecessarily long, consisting of only five double-spaced pages. The subject matter of the petition may be offensive to sensibilities, but that is so only because that is the nature of the beast, not because the pleader deliberately made it so.
Mr. Oswalt's filing of this petition should not be the focus of fault in this case. It is not right to blame him for doing his job. I would reverse the ruling that he committed a sanctionable offense.
COOKS, Judge, dissenting.
Brenda contends the trial court improperly granted Brent's peremptory exception of no cause of action and/or no right of action. She also notes the trial judge failed to specify which exception he granted. Brenda claims her petition states several theories of recovery based upon the facts alleged in her petition: (1) Breach of the contract to marry; (2) a claim in tort for fraud based on Brent's intentionally harmful, fraudulent and deceitful acts and his self-indulgent, negligent and avaricious courses of actions; (3) a detrimental reliance claim; and (4) abuse of the attorney/client relationship.
The peremptory exception of no right of action questions whether the party against whom it is asserted has any interest in judicially enforcing the right alleged against the exceptor. La.Code Civ.P. arts. 681 & 927; Meche v. Arceneaux, 460 So.2d 89 (La.App. 3 Cir.1984). The peremptory exception of no cause of action raises the question of whether the law affords any remedy to the plaintiff under the allegations in the petition. Crumling v. Crumling, 628 So.2d 1194 (La. App. 3 Cir.1993).
All well-pleaded allegations of fact are accepted as true and correct and for purposes of its determination, all doubts are resolved in favor of sufficiency of the petition. State, DOTD v. Estate of Payne, 586 So.2d 737 (La.App. 3 Cir.1991). Pleadings must be reasonably construed so as to afford litigants their day in court, to arrive at the truth, and to do substantial justice. La. Code Civ.P. art. 865; Kuebler v. Martin, 578 So.2d 113 (La.1991). If the petition states a cause of action as to any ground or portion of demand, the exception no cause of action must be overruled. Bellah v. State Farm Fire & Cas. Ins., 546 So.2d 601 (La.App. 3 Cir.1989).
As the majority notes Louisiana jurisprudence clearly recognizes a cause of action for damages when a party breaches a promise to *881 marry. Glass v. Wiltz, 551 So.2d 32 (La.App. 4 Cir.), writ denied, 552 So.2d 400 (La.1989); Daigle v. Fournet, 141 So.2d 406 (La.App. 4 Cir.1962); Ricketts v. Duble, 177 So. 838 (La.App. Orleans 1938); Decuers v. Bourdet, 10 La.App. 361, 120 So. 880 (Orleans 1929). However, the majority ultimately concludes Brenda does not have cause of action because Brent's promise to marry was made while he was already married; and, his promise, therefore, was illegal, void and unenforceable. To buttress this conclusion, they also declare such a promise violates public policy and undercuts the marital obligations recognized by law.
In Thomason v. Thomason, 355 So.2d 908 (La.1978), the Louisiana Supreme Court reviewed and overruled the jurisprudentially created recrimination doctrine. This doctrine denied divorce to a spouse who was guilty of conduct that would entitle the other spouse a divorce. The recrimination doctrine resulted in the denial of a divorce in cases where both parties were equally guilty, thereby sentencing them to continue as a married couple even though they proved they were incompatible. The Court acknowledged forcing a couple to remain married did not strengthen the institution of marriage nor serve any useful social purpose. It declared the State does not have an interest in forcing one spouse to remain married to another. Moreover, the 1990 revisions of the Civil Code provisions concerning divorce simplified the process of obtaining a divorce. Rigby & Spaht, Louisiana's New Divorce Legislation: Background and Commentary, 54 La.L.Rev. 19, 75 (1993). Today, one spouse may unilaterally seek a divorce without alleging fault. Permitting a married person to contract to marry another does not violate public policy because the State does not have an interest in forcing a spouse to remain married to his or her spouse.[1] Thus, Brenda's petition states a cause of action arising from a breach of contract to marry.
Furthermore, Brenda's petition is sufficient if she articulated facts which support a legally recognized claim, though different from that stated or specifically identified by her. Bellah v. State Farm Fire & Cas. Ins., 546 So.2d 601 (La.App. 3 Cir.1989). The Roman law from which Louisiana Civilian System, in part, arose long recognized as stated in the seventh Partida, tit. IX, law 5 (Moreau & Carleton's Edition) vol. II, p. 1176, viz.:
"Men sometimes offend, dishonour and harass, by various means, married or unmarried women, or widows who lead virtuous lives at home and enjoy good characters, by endeavoring frequently to speak with them, either in the houses where they dwell, or by following them in the streets, churches or other places where they are to be found; or by secretly sending jewels to them and those with whom they live, in order to corrupt them both; at other times by endeavoring to corrupt them, by means of pimps, and in various other ways, so that by great importunity and artifice, there are some women who are finally seduced. An even good women who resist their attempts are, in a manner, injured in their character, inasmuch as they will be suspected of committing some evil with those who pursue them so assiduously, in either of the ways above mentioned. Wherefore we consider that they who conduct themselves in this manner do great wrong and injury to such women, as well as their fathers, husbands, fathers in law, and other relations. We therefore ordain that every man who shall offend in either of the ways herein mentioned shall make amends to the woman who sustains injury thereby." (Emphasis added.)
Although Roman and Spanish laws did not recognize a right of action for damages arising from alienation of affection by a spouse, father, father-in-law, or other relation, the woman, married or unmarried, "[offended, dishonored, and harassed]," by a man's advances was entitled to seek amends from him for the injury caused her.
Moreover, Brenda's amended petition attempts to assert a cause of action for intentional infliction of emotional distress, also *882 legally recognized in this state. Scamardo v. Dunaway, 650 So.2d 417, 94-545 (La.App. 5 Cir. 2/15/95); Greene v. Roy, 604 So.2d 1359 (La.App. 3rd Cir.1992), writ denied, 607 So.2d 544 (La.1992). As provided by Louisiana Civil Code of Procedure article 934, Brenda is entitled to an opportunity to amend her petition and thereby allege sufficient facts to state a course of action for intentional infliction of emotion distress. Minimally, the case should be remanded to afford her this opportunity.
The majority's decision to publish the opinion renders moot any need to discuss the propriety of the trial judge's decision to seal the record. The majority's extensive reference to portions of the petition will sufficiently memoralize the allegations contained therein for all who may have interest to read.
I also disagree strongly with the majority's decision to affirm that portion of the trial court's judgment sanctioning Brenda's attorney for filing a verified petition. A trial judge's decision to sanction an attorney pursuant to the authority granted in La.Code Civ.P. art. 893 is reviewed by employing the manifest error or clearly wrong standard. The extent of such sanction, however, is reviewed by utilizing the abuse of discretion standard. Penton v. Clarkson, 93-0657 (La. App. 1 Cir. 3/11/94); 633 So.2d 918.
La.Code Civ.P. art. 863(B) provides:
[T]he signature of an attorney or party shall constitute a certification by him that he has read the pleading; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well ground in fact; that it is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
During the hearing on the rule to show cause, the trial judge declared the language in Brenda's petition, presumably the frank allegations concerning Brent's and Brenda's sexual activity and Brent's and his wife's lack thereof, would not be tolerated in his court. Brenda asserts this does not constitute a basis for sanctions. I agree.
Brent's only complaint regarding Brenda's allegations is that she did not have to state the "sordid details" of their relationship. He does not assert the allegations are untrue. I have reviewed the language used in the petition, and I believe the words are not vulgar or otherwise obscene. When articulating the facts forming the basis of a lawsuit, an attorney is not required to tailor his expression to please "Victorian sensibilities."
NOTES
[1] See Planiol, Traite Elementaire de Droit Civil, English Translation by the Louisiana State Law Institute, § 781 et seq., p. 454 (1959).
[2] See H.S. Daggett, Legal Essays on Family Law, The Action for Breach of the Marriage Promise 39-100 (1935).
[3] La.Civ.Code art. 161, as it existed in 1938, prohibited divorced persons from marrying their accomplices in adultery under penalty of nullity of the new marriage. This nullity was enforced in Rhodes v. Miller, supra.
[1] I note La.Civ.Code art. 88, titled "[i]mpediment of existing marriage," provides "[a] married person may not contract another marriage." The comments to this article reveals it refers to bigamous marriages.