963 P.2d 818 (1998)
136 Wash.2d 405
In re DISCIPLINARY PROCEEDING AGAINST James A. HEARD, Attorney at Law, Bar No. 12272.
No. 12272-5.
Supreme Court of Washington, En Banc.
Argued March 11, 1998.
Decided September 24, 1998.
*820 Washington State Bar Association, Maureen T. Devlin, Randy V. Beitel, Seattle, for Respondent.
John L. Farra, Aberdeen, for Petitioner.
*819 TALMADGE, Justice.
In this case we review the Washington State Bar Association (WSBA) Disciplinary Board's (the Board) unanimous recommendation of a two-year suspension of an attorney's license to practice law. The recommendation is based on two principal areas of misconductthe attorney's mishandling of a client's personal injury settlement and his sexual exploitation of that client.
James Heard negotiated a settlement on behalf of his client during the handling of a personal injury matter. He evaluated the case at more than $150,000, and retained the only cash in the settlement$50,000 in insurance proceeds. However, much of the settlement's "value" ultimately proved to be illusory. During the process, Heard failed to apprise his client of the problematic quality of the settlement or that he was retaining the only cash in the settlement.
Heard also committed an act of moral turpitude by exploiting his professional relationship with the client to give her alcohol and have sexual relations with her, knowing she had a history of alcohol and drug problems and had sustained severe head injuries in an accident.
We affirm the Board's determination Heard violated the Rules of Professional Conduct (RPC) in handling the settlement and the Rules of Lawyer Discipline (RLD) by engaging in an act of moral turpitude. We suspend him for two years from the practice of law and order him to pay restitution and costs.

ISSUES
1. Does an attorney violate the RPC by negotiating a settlement agreement with worthless interests included, advising his client to sign it, and then keeping all the cash proceeds of the settlement without the client's consent or without rendering the client a final accounting?
2. Does an attorney commit an act of moral turpitude within the meaning of the RLD if he exploits his professional relationship with a vulnerable client by providing her alcohol and having sexual relations with her?

FACTS
In 1989, 23-year-old Katrina Menz was seriously injured in an accident while a passenger on a motorcycle. Menz sustained severe head injuries from the accident, was comatose for a week, and remained in the hospital for several weeks thereafter. Menz's mother retained attorney James A. Heard, then 43-years-old, to represent Menz in her action to recover damages for her injuries. Although Menz's mother signed the retainer agreement, Katrina Menz never did. The retainer agreement provided for a contingent fee paying Heard one-third of all funds collected on Menz's behalf.
Heard sought insurance payments from various insurers. He obtained payment from Menz's insurer, Viking Insurance Company, which paid Menz $25,000 under the under insured motorist coverage provision of her automobile liability insurance policy. He obtained a $25,000 settlement from the liability *821 insurer for the co-owners of the motorcycle, Edward and Virginia Gerrish.
Heard also filed a lawsuit for Menz against the driver of the motorcycle, Richard McKee. Heard negotiated a settlement with McKee, who was apparently uninsured. In exchange for a release of liability, McKee gave Menz: (1) his 1987 Mazda RX7; (2) a $35,000 unsecured promissory note; and (3) a quitclaim deed for a $50,000 interest he allegedly held in his sister's Seattle home. The settlement agreement asserted a value for the Mazda RX7: "I agree that the value of said automobile shall be Fifteen Thousand Dollars ($15,000)." Ex. 3. The car's actual value was never determined by appraisal or otherwise. Menz took title and possession of the car. Similarly, the promissory note was valued at $35,000, although Menz exchanged it with the Department of Social and Health Services (DSHS) in full satisfaction of a $46,890 past medical payment lien DSHS held against any tort recovery Menz obtained.[1]
The most problematic of the settlement's features was McKee's alleged interest in his sister's house. The settlement agreement explained that McKee had loaned his sister $40,000 and, in return, he was claiming an "untitled interest" in her house worth perhaps $50,000. Ex. 3. The agreement, as drafted by Heard, provided a "warranty" by McKee: "I agree that my interest in said real property is Fifty Thousand Dollars ($50,000.00), although the actual interest of my equity in the property may be less than $50,000.00 but I warrant that it is no less than $40,000." Ex. 3. The interest in the house was never appraised. McKee had no recorded property interest in the house and no security interest. Heard's office called McKee's sister shortly after the negotiation of the settlement and confirmed McKee's sister alone owned the house and she planned to sell it. Heard never relayed this information to his client. McKee's sister sold the house shortly thereafter. Menz never received a deed reflecting McKee's alleged interest in the house, nor anything of value with respect to McKee's "interest."
Prior to the conclusion of the settlement, Heard went to Menz's house and asked her if she would like to discuss the case. Heard knew of Menz's vulnerability, having had access to her medical history. He had successfully secured a guardian ad litem for her in the lawsuit and had instituted a separate guardianship proceeding, which was later dropped.[2] He also knew she had prior problems *822 with drug and alcohol abuse. Moreover, he knew she was scheduled for further surgery, a cranio-plasty, in February 1990. Nevertheless, they went to a local lounge to "discuss her case" where they started drinking. They then decided to visit another local lounge. Heard told Menz to drive his car despite her protests that she should not drive due to her status as a habitual traffic offender. After more drinking at a second lounge, they returned to Heard's apartment where they had consensual sexual relations.[3]
Upon negotiation of the settlement, Heard unilaterally decided to keep the $50,000 cash for his fee. He calculated the entire settlement was worth $150,000 by adding together the $50,000 actually recovered from the insurance companies, $15,000 for the alleged value of the Mazda, $35,000 for the alleged value of the promissory note, and $50,000 for the value of the alleged interest in McKee's sister's house. Heard never obtained his client's consent to this arrangement, and never gave her an accounting of the handling of the settlement proceeds.
Menz subsequently commenced a malpractice action against Heard, which is currently pending. Upon Menz's complaint, the WSBA filed a formal eight-count disciplinary complaint against Heard for his conduct in representing Menz, alleging he charged Menz a fee contrary to the fee agreement in violation of RPC 1.5(a); never obtained Menz's signature on the retainer agreement in violation of RPC 1.5(c); failed to provide Menz with a written final accounting of the case in violation of RPC 1.5(c)(1); incompetently represented Menz by advising her to sign the McKee settlement agreement without first determining whether the interest existed in violation of RPC 1.1; failed to communicate with Menz and explain matters sufficiently to allow her to make a reasonable choice regarding settlement; failed to communicate with Menz regarding his knowledge that McKee owned no interest in his sister's house in violation of RPC 1.4; failed to represent Menz with due diligence by failing to secure an interest in McKee's sister's house in violation of RPC 1.3; and committed an act of moral turpitude in violation of RLD 1.1(a) by having sexual relations with Menz.
On December 14 and 15, 1995, a formal disciplinary hearing was held pursuant to RLD 4.10 before a hearing examiner. In a written opinion, the hearing examiner concluded the WSBA failed to meet its burden of proof on each count. WSBA disciplinary counsel appealed this decision to the Board pursuant to RLD 6.1, which allows parties, including disciplinary counsel, to appeal decisions of the hearing examiner to the Board.
In a written opinion, the Board reversed the hearing examiner on seven of the eight counts, finding the hearing examiner's conclusions were not supported by the evidence or by the law. The Board found no violation as to Heard's alleged failure to obtain Menz's signature on the retainer, but sustained the other seven charges against Heard.
As to sanctions, the Board recommended a two-year suspension of Heard's license to practice and ordered him to pay restitution in the amount of $28,334.34 plus interest and costs. The Board based its sanctions recommendation on a finding of numerous aggravating circumstances including dishonest or selfish motives, vulnerability of victim, refusal to acknowledge wrongdoing, and indifference in making restitution. Heard appealed the Board's decision and sanctions recommendation to us. RLD 7.2.

ANALYSIS
The Washington State Supreme Court exercises plenary authority in matters of attorney discipline. RLD 2.1. Nevertheless, we have delegated specific responsibilities with respect to attorney discipline to the WSBA pursuant to the provisions of the RLD. With respect to initial fact-finding, a hearing examiner makes initial recommendations to the Board as to findings and *823 conclusions. The Board is free to adopt, modify, or reverse findings, conclusions or recommendations of its hearing examiner. RLD 6.7(e); In re Disciplinary Proceeding Against Lynch, 114 Wash.2d 598, 607-08, 789 P.2d 752 (1990).[4] We do not disturb the Board's findings if they are supported by the clear preponderance of the evidence. RLD 4.11(b); In re Disciplinary Proceeding Against Allotta, 109 Wash.2d 787, 792, 748 P.2d 628 (1988); In re Disciplinary Proceeding Against Curran, 115 Wash.2d 747, 759, 801 P.2d 962, 1 A.L.R.5th 1183 (1990); In re Disciplinary Proceeding Against McMullen, 127 Wash.2d 150, 161-62, 896 P.2d 1281 (1995). In this case, the Board's findings of fact, as adopted from the hearing examiner and modified by the Board are amply supported by the record.
The Board's findings and recommendations essentially involve three issues: Heard's alleged misconduct involving the settlement agreement and his fee, Heard's alleged act of moral turpitude, and the sanction to be imposed against Heard, if any. We address each of these issues in order.
A. Misconduct Involving the Settlement Agreement
The first seven counts against Heard all relate to the settlement agreement he negotiated for Menz and his fee.
Count I alleges Heard charged a fee contrary to the fee agreement in violation of RPC 1.5(a) which states: "A lawyer's fees shall be reasonable." The Board found Heard violated this rule by taking a $50,000 fee when the entire settlement was actually worth far less than the $150,000 value Heard attributed to it.
The settlement included $50,000 in insurance money, and the 1987 Mazda RX7. The Board accepted McKee's valuation of the vehicle at $15,000. Clerk's Papers at 224.[5] The McKee settlement also included a $35,000 promissory note given by McKee to Menz. Menz negotiated this note to DSHS in exchange for full satisfaction of DSHS's $46,890 lien for public medical expenses paid on Menz's behalf. The Board, without explanation, concluded that Heard's taking of one-third of the $35,000 promissory note "was both contrary to Washington law, and unreasonable." Clerk's Papers at 224.
However, contrary to the Board's conclusion, the promissory note obviously had a significant value, given the willingness of DSHS to take it in exchange for Menz's lien. While the note was worth $35,000 on its face and was exchanged for a $46,890 lien, there is no indication of its fair or market value. A $35,000 unsecured promissory note from a party who apparently had financial problems may be worth less than face value. See Stuart M. Speiser, Attorney's Fees § 2:15, at 103-04 (1973) (property may be included in settlement package for contingent fee purposes, but the fair or market value thereof is established "without regard to the price at which it was taken."). Heard should have made some attempt to place value on the promissory note, or in the alternative, to agree on a fair value thereof with his client.
A more troublesome question is Heard's failure to implement the statutory scheme of *824 RCW 43.20B.060 so as to secure DSHS's contribution of a share of Heard's fees incurred by Menz to collect the lien. Heard's failure in this regard meant that Menz paid more in fees to Heard than she otherwise needed to.
Finally, Heard improperly included McKee's alleged $50,000 interest in his sister's house as part of the overall recovery. Heard knew, or should have known, McKee's interest in his sister's house was essentially worthless. Indeed, Heard himself drafted the settlement agreement which stated McKee had an "untitled interest" in his sister's house. Ex. 3. The settlement further stated: "I agree that my interest in said real property is Fifty Thousand Dollars ($50,000.00), although the actual interest of my equity in the property may be less than $50,000.00, but I warrant that it is no less than $40,000.00." Ex. 3. Nothing ever came of this illusory interest. Heard knew the interest was worthless when his office contacted McKee's sister. Yet, he did not advise Menz of its essential worthlessness. Heard considered the worthless interest in the value of the settlement for purposes of calculating his contingent fee, and therefore violated RPC 1.5(a).[6]
Count III alleges Heard failed to provide Menz a written final accounting of the case in violation of RPC 1.5(c)(1). That rule states: "Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination." Heard failed to provide such accounting.
Count IV alleges Heard incompetently represented Menz by advising her to sign a settlement agreement with McKee without first determining whether the interest existed in violation of RPC 1.1 which states: "[a] lawyer shall provide competent representation to a client." Heard knew, or should have known, McKee's alleged interest in his sister's house was not perfected. Indeed, the settlement agreement, drafted by Heard himself, referred to the interest as "untitled." Heard should have advised Menz of the facts before recommending she accept the settlement.
Count V alleges Heard failed to explain matters to Menz sufficiently to allow her to make a reasonable choice regarding settlement. Count VI alleges Heard failed to communicate with Menz regarding his knowledge that McKee owned no interest in his sister's house in violation of RPC 1.4. He failed to communicate both.
Count VII alleges Heard failed to represent his client with due diligence for failing to secure an interest in McKee's sister's house in violation of RPC 1.3, which provides, "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Heard failed to take any tangible steps to provide any interest for Menz in the house.
We uphold the Board's findings and conclusions with respect to the charges relating to Heard's handling of the settlement agreement and his fee. In effect, Heard put his own interests ahead of those of his client. He negotiated a settlement of Menz's personal injury claims that largely reserved the tangible, cash benefits of the settlement to himself. The inflated or illusory settlement assets were Menz's. Heard neither explained the implications of the settlement to the client before recommending she agree to it nor accounted to her for his decisions regarding the disposition of the settlement proceeds. Heard violated the RPC by such conduct.
B. Moral Turpitude
Count VIII alleges Heard committed an act of "moral turpitude" in violation of the Rules of Lawyer Discipline 1.1(a) by having sex with his client. RLD 1.1 provides:
A lawyer may be subjected to the disciplinary sanctions or actions set forth in these rules for any of the following:
(a) The commission of any act involving moral turpitude, dishonesty, or corruption, *825 or any unjustified act of assault or other act which reflects disregard for the rule of law ....
The RLD does not specifically define the term "moral turpitude," although we have previously sustained attorney discipline based on findings of moral turpitude. In In re Disciplinary Proceeding Against McGrath, 98 Wash.2d 337, 655 P.2d 232 (1982), reinstatement granted, 112 Wash.2d 481, 772 P.2d 502 (1989), we recognized the general nature of "moral turpitude":
This definition of moral turpitude is necessarily general. In the setting of attorney discipline, its application depends upon the collective conscience and judgment of the members of this court. It is as meaningful as other phrases adopted by other courts. See Searcy v. State Bar of Texas, 604 S.W.2d 256, 258 (Tex.Civ.App.1980) which sets forth the various definitions. "Its definition does not gain in clarity by prolixity of statement." In re Jacoby, 74 Ohio App. 147, 155, 57 N.E.2d 932 (1943). See also 58 C.J.S. Moral 1200-07 (1948).
Id. at 342, 655 P.2d 232. We essentially look to the inherent nature of the act committed by the attorney to answer the following question:
[D]o the acts found against the appellant, and for which he was convicted ..., violate the commonly accepted standard of good morals, honesty, and justice? Suppose we measure his conduct in this regard, not by any puritanical standard, but by the standard of right conduct generally prevailing among our people, uninfluenced by the fact that the statute law also punishes such conduct as a crime. What, then, is the answer to the question whether or not such acts involve moral turpitude?
In re Disciplinary Proceeding Against Hopkins, 54 Wash. 569, 572, 103 P. 805 (1909). See also In re Disciplinary Proceeding Against Stroh, 97 Wash.2d 289, 644 P.2d 1161 (1982) (attorney's crime of tampering with a witness strikes at the very core of the judicial system and therefore necessarily involves moral turpitude), cert. denied, 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983); McGrath, 98 Wash.2d at 340-43, 655 P.2d 232 (attorney's assault in the second degree involving a deadly weapon constituted moral turpitude).[7]
Although seven states have adopted explicit limitations on attorney-client sexual relations,[8] Washington has not adopted such a rule. The WSBA recently proposed such a rule to this Court which stated: "[i]t is professional misconduct for a lawyer to ... have sexual relations with a current client of the lawyer unless a consensual sexual relationship existed between them before the lawyer/client relationship commenced." RPC Proposed Rule 8.4, quoted in Molly A. McQueen, Regulating Attorney-Client Sex: The Need for an Express Rule, 29 GONZ. L. REV. 405, 412 (1993/94). However, we did not adopt it. McQueen, 29 GONZ. L.REV. at 412.
Despite the absence of an express rule banning attorney-client sexual relations, an attorney's sexual relations with a client can constitute "moral turpitude," justifying the imposition of disciplinary sanctions. See, e.g., In re Disciplinary Proceeding Against Rinella, 175 Ill.2d 504, 677 N.E.2d 909, 222 Ill.Dec. 375, cert. denied, ___ U.S. ___, 118 *826 S.Ct. 371, 139 L.Ed.2d 288 (1997), therein the Supreme Court of Illinois suspended an attorney from practice for three years, rejected his argument that he could not be sanctioned for engaging in sexual relations with his clients because no disciplinary rule specifically proscribes such conduct. The Rinella Court noted:
Initially, we reject respondent's contention that attorney misconduct is sanctionable only when it is specifically proscribed by a disciplinary rule. On the contrary, the standards of professional conduct enunciated by this court are not a manual designed to instruct attorneys what to do in every conceivable situation....
[W]e do not believe that respondent, or any other member of the bar, could reasonably have considered the conduct involved here to be acceptable behavior under the rules governing the legal profession.
Rinella, 175 Ill.2d at 514-15, 677 N.E.2d at 914, 222 Ill.Dec. at 380. The court in Matter of DiSandro, 680 A.2d 73, 75 (R.I.1996), noted there was no provision in the rules of professional conduct regarding sexual activity between attorneys and clients, but found respondent had violated ethical rules by engaging in a consensual sexual relationship with a client. In People v. Good, 893 P.2d 101 (Colo.1995), the court recognized that no rule explicitly prohibits a sexual relationship between attorney and client, but found Good had violated the state's ethical rules and suspended him for one year, noting:
Because the lawyer stands in a fiduciary relationship with the client, an unsolicited sexual advance by the lawyer debases the essence of the lawyer-client relationship. Often the lawyer-client relationship is characterized by the dependence of the client on the lawyer's professional judgment, and a sexual relationship may well result from the lawyer's exploitation of the lawyer's dominant position. See ABA Comm. on Ethics and Professional Responsibility, Formal Op. 92-364 at 2.
Good, 893 P.2d at 103 (citation omitted). See also In re Disciplinary Proceeding Against Berg, 264 Kan. 254, 955 P.2d 1240 (1998) (Kansas Supreme Court disbarred Berg for sexual exploitation of clients, rejecting his assertion that he violated no specific rule by engaging in sexual relations with his clients). See also Jill M. Crumpacker, Note, Regulation of Lawyer-Client Sex: Codifying the "Cold Shower" or a "Fatal Attraction" Per Se?, 32 Washburn L.J. 379 (1993) (discussing both sides of the issue and noting arguments against adoption of a specific rule regulating lawyer-client sex include that such rule would be redundant as existing ethics rules prohibiting attorneys from exercising undue influence or taking unfair advantage already address the issue). Id. at 395 & n. 132. See also Gregory G. Sarno, Annotation, Sexual Misconduct as Ground for Disciplining Attorney or Judge, 43 A.L.R.4th 1062 (1986) & (1997 Supp. at 67-74) (collecting and discussing cases in which sanctions from reprimand to disbarment were imposed upon attorneys' regarding their sexual improprieties, including sexual relations with clients).
We have taken a similar approach on the need for an express rule banning professional-client sexual relations in Washington. Haley v. Medical Disciplinary Bd., 117 Wash.2d 720, 818 P.2d 1062 (1991), is instructive on this point. In Haley, we held conduct occurring after the termination of the professional relationship and unrelated to the specific technical skills necessary for the professional practice may still subject a professional to discipline. Haley, 117 Wash.2d at 733-35, 818 P.2d 1062.
In Haley, a 66-year-old physician performed surgery on a girl not yet 16-years-old. Thereafter, subsequent to the conclusion of the physician-patient relationship, the doctor provided alcohol to the girl and commenced a sexual relationship with her. She moved into a beach house to which the physician had access. We upheld the Medical Disciplinary Board's finding of acts of "moral turpitude," and the Board's decision to suspend the physician from practice for 10 years (although the suspension was stayed subject to numerous conditions). We found the physician used his professional status and position to sexually exploit a minor, given his psychological authority and power over the patient, and his behavior cast the medical profession in disrepute in the eyes of the *827 public. Haley, 117 Wash.2d at 735-36, 818 P.2d 1062.
The disciplinary rules for physicians specifically prohibited sexual contact with a patient. RCW 18.130.180(24). However, we found the rule was not violated because the physician-patient relationship had concluded. Haley, 117 Wash.2d at 728-31, 818 P.2d 1062. Thus, Haley indicates a professional may violate rules banning acts of moral turpitude even where specific rules forbidding sex with clients do not apply. As we stated in Haley: "[w]e believe that any reasonable physician would recognize that such conduct is an abuse of the trust inherent in the physician's role and an appropriate subject for professional discipline." Id. at 743, 818 P.2d 1062. The same can be said of Heard's conduct here.
The facts in the present case are quite similar to those in Haley, and may be more egregious in several respects. Heard used his professional relationship with Menz to initiate the social relationship (he went to her home and invited her to "go out" to discuss her case). As Menz's attorney, Heard had intimate knowledge of her vulnerabilities. Heard knew Menz had sustained a significant head injury for which she required multiple surgeries, and she was psychologically and physically impaired, undergoing a period of prolonged rehabilitation. Through access to her medical records, Heard knew Menz had an extensive history of alcohol and drug problems, and had been sexually abused. He further knew that as a result of her brain injury Menz continued to have memory, reading comprehension, auditory processing, attention, speech, problem solving and other cognitive deficits. He also knew her medical providers were concerned about her judgment, safety and ability to live independently. Despite this knowledge, Heard took Menz to two cocktail lounges and gave her alcoholic beverages at both. When Menz informed Heard she should not be drinking, he assured her that everything would be all right. Heard then took Menz to his apartment where they engaged in sexual relations. Heard sexually exploited a client with alcohol problems and who suffered the effects of serious head injuries. Heard's use of his professional position to exploit a vulnerable young woman constituted moral turpitude within the meaning of RLD 1.1.[9]
C. Sanction
Heard violated the RPC in connection with the settlement agreement and the fees, and committed an act of moral turpitude under the RLD. Counsel for the WSBA requested a six-month suspension for the violations, but the Board imposed a two-year suspension.
Initially, we note Heard has not assigned specific error to the Board's findings as to the recommended sanction. Those findings are verities on appeal. In re Disciplinary Proceeding Against Johnson, 118 Wash.2d 693, 701, 826 P.2d 186 (1992).
While we generally adopt the Board's sanction recommendation, we are not bound by that recommendation. RLD 2.1; In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 95, 667 P.2d 608 (1983); In re Disciplinary Proceeding Against Felice, 112 Wash.2d 520, 526, 772 P.2d 505 (1989) ("The Supreme Court of Washington has exclusive responsibility to determine what discipline should be imposed for a lawyer's acts of misconduct."). In specific, we will adopt the Board's recommendation on a sanction unless we can articulate specific grounds based on one or more of the following factors to support departure from the Board's recommendation.
1. The purposes of attorney discipline (sanction must protect the public and deter other attorneys from similar misconduct);
2. The proportionality of the sanction to the misconduct (sanction must not depart significantly from sanctions imposed in similar cases);

*828 3. The effect of the sanction on the attorney (sanction must not be clearly excessive);
4. The record developed by the hearing panel (sanction must be fairly supported by the record and must not be based upon considerations not supported by the record); and,
5. The extent of agreement among the members of the Board (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons).
In re Disciplinary Proceeding Against Johnson, 114 Wash.2d 737, 752, 790 P.2d 1227 (1990); In re Disciplinary Proceeding Against Johnson, 118 Wash.2d 693, 703, 826 P.2d 186 (1992); In re Disciplinary Proceeding Against McMullen, 127 Wash.2d 150, 162, 896 P.2d 1281 (1995). In this case, we can articulate no reason to depart from the Board's unanimous recommendation.
We have generally expressed a need for consistency in setting sanctions for violations of the Rules of Professional Conduct, and toward that end have adopted the ABA Standards for Imposing Lawyer Sanctions (1986). Matter of Disciplinary Proceeding Against Curran, 115 Wash.2d 747, 770-71, 801 P.2d 962, 1 A.L.R.5th 1183 (1990). The ABA Standards (1991 ed.) states that "Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." Standards 4.12, at 27. In Washington, two years is the maximum period of suspension. RLD 5.1(b).
In the present case, the combination of misconduct involving the settlement and attorney fees, and the act of moral turpitude justify a two-year suspension. Indeed, the ABA Standards suggests disbarment may be appropriate here. See Standards 4.11 ("Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client."). We have also noted disbarment may be appropriate in such circumstances. In In re Disciplinary Proceeding Against Salvesen, 94 Wash.2d 73, 76, 614 P.2d 1264 (1980), we noted:
When lawyers use clients' funds for their own personal use or mishandle trust funds, disbarment is the usual result. It is not the inevitable result, however, and the appropriate sanction should be determined on a case-by-case basis after consideration of all the circumstances.
(Citations omitted.) In that case, which predated the ABA standards, we imposed a two-year suspension for misuse of client funds, on the basis of extensive mitigating circumstances.[10] The case was a 5 to 4 decision, with a vigorous dissent advocating disbarment.
Here, Heard's financial misconduct is compounded by an act of moral turpitude. We have found acts of moral turpitude to constitute grounds for disbarment. See In re Disciplinary Proceeding Against McGrath, 98 Wash.2d 337, 655 P.2d 232 (1982) (assault with a deadly weapon involved moral turpitude and warranted disbarment), reinstatement granted, 112 Wash.2d 481, 772 P.2d 502 (1989); In re Disciplinary Proceeding Against Stroh, 97 Wash.2d 289, 644 P.2d 1161 (1982) (tampering with a witness necessarily involves moral turpitude and warrants disbarment), cert. denied, 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983).
In general, we can see no reason for departing from the Board's recommended sanction of two years' suspension, even though there are arguable grounds for Heard's disbarment. None of the Johnson factors for *829 departing from the Board's recommendation are met here.
Finally, the Board imposed restitution in the amount of $28,334.34 plus interest. Restitution is properly imposed against an attorney who has been found to have committed an act of misconduct and has been sanctioned for such misconduct. RLD 5.3(a); In re Disciplinary Proceeding Against Hankin, 116 Wash.2d 293, 298, 804 P.2d 30 (1991); In re Disciplinary Proceeding Against Johnson, 118 Wash.2d 693, 707, 826 P.2d 186 (1992).
We believe restitution was properly assessed against Heard, but we remand this case to the Board to re-evaluate the restitution owed by Heard. The Board determined only $65,000 of the settlement was tangible, and permitted a contingent fee on that sum. The Board properly required Heard to disgorge the remainder of the fee. As noted above, we believe Heard failed to secure an independent valuation of the automobile and the promissory note. The Board must consider the proper value of both in setting restitution.

CONCLUSION
James Heard engaged in numerous instances of misconduct involving the negotiation of a settlement agreement and the fee he earned for his work. He made matters worse by exploiting his authority as an attorney and taking advantage of an exceedingly vulnerable client to have sexual relations with her. We do not condone such exploitative behavior. The Board properly found Heard to have violated the RPC and the RLD and appropriately sanctioned him by suspending his license for two years, and ordering him to pay restitution to Menz. We also award costs on appeal to the WSBA.
DURHAM, C.J., and SMITH, GUY, MADSEN and ALEXANDER, JJ., concur.
JOHNSON, Justice, concurring/dissenting.
I agree with the majority as to issue one, misconduct involving the settlement agreement. I disagree, however, with the majority's analysis and discussion of issue two, moral turpitude, and join with Justice Sanders' analysis.
SANDERS, Justice, dissenting.
The majority's affirmation of discipline against Attorney James A. Heard rests on two doubtful propositions: (1) we review factual findings of the Disciplinary Board rather than findings made by the hearing examiner who actually received the evidence and had the opportunity to judge the credibility of the witnesses before him; and (2) an attorney may be disciplined for an act of "moral turpitude" without necessity to prove that the act also "reflects disregard for the rule of law." RLD 1.1(a).

Factual Findings of Hearing Examiner, Not Disciplinary Board, Are Dispositive
The facts as recounted by the majority, and the Disciplinary Board, are not the facts found by the hearing examiner. The examiner,[1] an experienced practitioner appointed by the Disciplinary Board to receive and evaluate this evidence, found, as a matter of fact, Bar counsel had simply failed to prove its various claims of misconduct by "a clear preponderance of the evidence." RLD 4.11(b); In re Discipline of Allotta, 109 Wash.2d 787, 792, 748 P.2d 628 (1988). This is not surprising as we have previously held the requisite standard of proof is a high one where
Every doubt should be resolved in his [the attorney's] favor, and only upon a clear preponderance of the evidence that the acts charged have been done, and were prompted by improper motives, should disciplinary action be taken. The privilege and it is a privilege, not a rightto practice his profession cannot be lost to the practitioner upon slight evidence.
In re Discipline of Little, 40 Wash.2d 421, 430, 244 P.2d 255 (1952).
The hearing examiner conducted a thorough hearing over the course of two days. Both sides were represented by counsel. Numerous witnesses, including Katrina Menz *830 and James Heard, testified and were cross-examined.
The examiner detailed his factual findings in 28 numbered paragraphs beginning: "All witnesses who testified were credible. Memories, however, differed among the several witnesses to many of the 5 and 6 year old events." Clerk's Papers (CP) at 151 (Hearing Officer's Findings of Fact, ¶ 1). He also found Heard negotiated "with exemplary skill" (CP at 155, ¶ 19) and "for the substantial benefit of his client" (CP at 155, ¶ 21). Regarding the alleged sexual affair, the examiner was simply not factually persuaded that it indeed occurred (CP at 157, ¶ 27).
The Disciplinary Board, however, reversed the hearing examiner, not only striking his Findings of Fact but substituting its own. The Board did so without ordering the proceedings reopened for additional evidence notwithstanding RLD 6.5, which explicitly allows for the reopening of proceedings with the caveat that no additional evidence may be considered by the Board unless the proceedings are reopened.
The question is therefore whether we are to accept for the purpose of review the hearing examiner's factual findings rather than those of the Board. But the majority asserts it was perfectly proper for the Disciplinary Board, in its appellate capacity (having never heard a witness), not only to vacate the hearing examiner's findings of fact but also to substitute its own (Majority at 822-823).
Citing (In re Discipline of Johnson, 118 Wash.2d 693, 703, 826 P.2d 186 (1992)), the majority states, "We give greater weight to the Board's conclusions than to those of the hearing examiner." Majority at 823 n. 4. But Johnson says nothing of the kind. It simply holds we defer to the Board's suggested punishment in cases where the hearing examiner and the Board recommend different punishments for the same violation. See Johnson, 118 Wash.2d at 703, 826 P.2d 186 ("While the hearing officer imposed only two reprimands and a censure, the Board majority imposed a 6-month suspension and the 5-person dissent recommended a 60-day suspension in conformity with bar disciplinary counsel's initial recommendation. While we accord greater weight to the conclusions of the Board than to the recommendation of the hearing officer with regard to the recommended sanction, the ultimate responsibility for determining the nature of disciplinenevertheless rests with this court.") (footnotes omitted). Johnson does not even suggest, much less hold, the Board may override the hearing examiner's findings of insufficient evidence.
Our long-standing rule requires appellate bodies not to disturb the hearing examiner's findings of fact, particularly when made upon conflicting evidence. In Little, a lawyer discipline matter, and the seminal case on this point, we held:
The evidence upon these issues was in sharp conflict. In proceedings of this nature, we have applied the rule that we will not ordinarily disturb the factual findings of a trial committee made upon conflicting evidence. The trial committee, before whom the witnesses appeared, was in a better position to judge their veracity and candor, and evaluate their testimony, than is either the board of governors or this court. We cannot say, from the record, that the evidence clearly preponderates against the trial committee's findings, and we will, therefore, accept them. The conclusion follows that the charges against respondent on this ground of complaint have not been sustained.

In re Discipline of Little, 40 Wash.2d 421, 427, 244 P.2d 255 (1952) (citation omitted).
The rule we enunciated in Little according due deference to the fact-finderremains good law. See In re Discipline of Witt, 96 Wash.2d 56, 57, 633 P.2d 880 (1981) ("The credibility and veracity of a witness obviously are best determined by the fact finder. We have long acknowledged that in disciplinary proceedings.") (citing Little). Pursuant to this general rule we must accept the hearing examiner's findings that the Bar Association failed to carry its burden.
The majority, however, subverts the rule by stating this court will "not disturb the Board's findings if they are supported by the clear preponderance of the evidence." Majority at 822-823 (citing In re Discipline of Allotta, 109 Wash.2d at 792, 748 P.2d 628; In *831 re Discipline of Curran, 115 Wash.2d 747, 759, 801 P.2d 962, 1 A.L.R.5th 1183 (1990); and In re Discipline of McMullen, 127 Wash.2d 150, 161-62, 896 P.2d 1281 (1995)). If such is indeed the rule, it is so only where the Board adopts the facts found by the hearing examiner. The cases relied upon by the majority simply do not support the broad assertion that the Board may simply disregard the hearing examiner's factual findings that the testimony presented failed to establish the offense by a clear preponderance of the evidence.
Indeed, the first case cited by the majority, In re Discipline of Allotta, nowhere even alludes to the proposition advanced by the majority. Nevertheless Allotta does state: "The hearing officer's findings of fact, while not conclusive, are nonetheless entitled to considerable weight. This is especially true when the credibility and veracity of witnesses are at issue .... The court does not attempt to substitute its evaluation of the credibility of witnesses for that of the hearing officer." 109 Wash.2d at 793-94, 748 P.2d 628 (citations omitted).
The second case cited by the majority, In re Discipline of Curran, 115 Wash.2d 747, 759, 801 P.2d 962, 1 A.L.R.5th 1183 (1990), does not support the majority's claim either. To the contrary, Curran states (at the precise page cited by the majority), "In evaluating a disciplinary charge this court will not disturb the hearing examiner's finding of facts if supported by evidence." 115 Wash.2d at 759, 801 P.2d 962 (citing In re Discipline of Felice, 112 Wash.2d 520, 525, 772 P.2d 505 (1989)).
In turn Felice unambiguously holds, "This court will not disturb a hearing examiner's findings of fact made upon conflicting evidence." 112 Wash.2d at 525, 772 P.2d 505. That is exactly our case as this hearing examiner made his findings on conflicting evidence.
The third case cited by the majority, In re Discipline of McMullen, 127 Wash.2d 150, 161-62, 896 P.2d 1281 (1995), likewise suggests we should not overturn the hearing examiner's findings. McMullen holds,
When evaluating an attorney discipline charge, this court does not disturb a hearing examiner's findings of fact if supported by the clear preponderance of the evidence.... This court is not to substitute its evaluation of the credibility of the witnesses over that of the hearing examiner. However, the conclusions of the Disciplinary Board regarding the proper sanction are accorded greater weight than those of the hearing examiner.
127 Wash.2d at 161-62, 896 P.2d 1281 (citations omitted).
At the threshold we are not concerned with the recommended sanction because, if there is no professional misconduct, there is no sanction. Rather we review the hearing examiner's factual findings. Precedent, and reason, require we defer to factual findings made by the trier of fact.[2] The hearing examiner took two days of evidence and concluded that the Bar Association failed to prove the charges by the applicable evidentiary standard. The examiner has no duty to believe the complainant. In fact, as the trier of fact, the hearing examiner was duly entitled to give whatever weight he deemed appropriate to any testimony received and was certainly entitled to disbelieve any witness's testimony in its entirety even if that testimony *832 was not directly contradicted. Plancich v. Williamson, 57 Wash.2d 367, 370, 357 P.2d 693, 92 A.L.R.2d 559 (1960) ("a trial court's refusal to find a fact will not be disturbed on appeal, even though the defendant's testimony on which a finding was requested was not directly contradicted.") (citing Dundon v. Dundon, 83 Conn. 716, 76 A. 1008 (1910)).
The majority not only errs when it defers to the Disciplinary Board, which ignored the factual findings of the hearing examiner, but compounds its error by allowing the Board to substitute its own supposed facts for those actually found by the trier of fact. The governing rule is universal that an appellate body may not substitute its judgment for that of the trier of fact. See Goodman v. Boeing Co., 75 Wash.App. 60, 82, 877 P.2d 703 (1994) ("An appellate court may not substitute its evaluation of the evidence for that made by the trier of fact.") (citing Washburn v. Beatt Equip. Co., 120 Wash.2d 246, 263, 840 P.2d 860 (1992)), aff'd, 127 Wash.2d 401, 899 P.2d 1265 (1995); Hosea v. City of Seattle, 64 Wash.2d 678, 683, 393 P.2d 967 (1964) ("If the record, evidentiary pattern, can be said to reasonably support the jury's determination, this should end the matter in terms of the review function of the appellate court. We are not to substitute our choice of values and judgment for that of the jury.") (citing McLeod v. Grant County Sch. Dist., 42 Wash.2d 316, 255 P.2d 360 (1953)). This rule applies with added force to cases where the trier of fact determines that the prosecution has failed to carry its burden of proof in criminal and quasi-criminal proceedings. In re Ruffalo, 390 U.S. 544, 551, 88 S.Ct. 1222, 20 L.Ed.2d 117, modified on other grounds, 392 U.S. 919, 88 S.Ct. 2257, 20 L.Ed.2d 1380 (1968) (attorney disciplinary actions are "adversary proceedings of a quasi-criminal nature" and the attorney subject to discipline is entitled to due process of law.).
In such situations the trier of fact's determination that the prosecution has failed to meet its burden ends the inquiry, and the appellate court may not reassess the credibility of testimony given to second-guess he who has actually viewed the evidence firsthand. State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990) ("Credibility determinations are for the trier of fact and cannot be reviewed on appeal.").
Therefore I conclude that the Disciplinary Board and the majority err in overturning the factual determinations made by the hearing examiner and err again when crediting the Disciplinary Board with the prerogative to substitute its own. On this basis, if no other, I would reinstate the hearing examiner's dismissal of the charges because the examiner is in the uniquely best position to judge whether the charges have been proved to the requisite factual standard.

Moral Turpitude
But if required for disposition, I would also disagree with the majority's legal conclusion that the Bar's allegation of sexual contact, even if proved on its face, constitutes a clear violation of the rules governing attorney discipline, as we rejected just such a bright-line rule several years ago and it is legally erroneous, if not patently unfair, to apply a rule without first adopting it.
At most under the current rules attorney-client sex is prohibited only if it violates some other rule set out in our Rules of Professional Conduct or the Rules for Lawyer Discipline; however, there is no violation under these facts.
Other jurisdictions are in accord. For example the West Virginia high court refused to find an attorney-client sexual relation in violation of the rules. Musick v. Musick, 192 W.Va. 527, 453 S.E.2d 361 (1994). The court explained,
Since no existing provision of the West Virginia Rules of Professional Conduct specifically prohibits a lawyer/client sexual relationship, we find that a lawyer's conduct of engaging in sexual relations with a client is not, in and of itself, a breach of professional responsibility at this time.
Id. 453 S.E.2d at 364.[3]
Similarly, in Edwards v. Edwards, 165 A.D.2d 362, 567 N.Y.S.2d 645 (1991) the New *833 York court was faced with a situation where attorney-client sex had occurred yet concluded it did not violate any particular rule and was therefore not subject to sanction. Relying on New York precedent on point, the court summarized, "In none of these cases was it the sexual relationship per se which constituted a breach of professional responsibility but rather the attorney's attempt to exploit the professional relationship to gain unsolicited sexual favors." Id. at 367, 567 N.Y.S.2d 645. The court continued by holding because there was no evidence that the attorney took advantage of the attorney-client relationship, or violated any other rule, there was no violation. Id.

In contrast are a few cases where attorney-client sex may involve alleged violation of some other rule. Compare, for example, In re McBratney, 320 S.C. 416, 465 S.E.2d 733 (1996), in which attorney sexual relations with client prejudiced terms of divorce settlement; however, here there is no allegation, nor even suggestion, this alleged act affected the representation. In fact by the time the single sexual act allegedly occurred the settlement had been finalized and further professional services were unnecessary.
The only rule arguably applicable is RLD 1.1 which provides:
A lawyer may be subjected to the disciplinary sanctions or actions set forth in these rules for any of the following:
(a) The commission of any act involving moral turpitude, dishonesty, or corruption, or any unjustified act of assault or other act which reflects disregard for the rule of law, whether the same be committed in the course of his or her conduct as a lawyer, or otherwise....
While the majority looks to itself, the practitioner must look to the rule. RLD 1.1(a) is qualified in two important respects: first, in pertinent part, it applies to acts of moral turpitude; second, it references acts which "reflect[] disregard for the rule of law."
As we recently explained, acts of moral turpitude usually involve evil intent. State v. Bash, 130 Wash.2d 594, 607, 925 P.2d 978 (1996).[4] But none was found here.
Moreover "moral turpitude" is vague and overly broad absent at least some nexus to the practice of law which is the only justification for any of these rules in the first place.
That nexus is also required by the very text of the rule which requires us to connect the act of moral turpitude with a finding that it "reflect[] disregard for the rule of law." RLD 1.1(a). Requiring such a link serves a rational purpose because, arguably, an attorney who acts with disregard for the rule of law may to that extent demonstrate unfitness to uphold the law which he practices. Cf. In re Discipline of Curran, 115 Wash.2d 747, 766, 801 P.2d 962, 1 A.L.R.5th 1183 (1990) ("RLD 1.1(a) speaks to the standards governing discipline in order to encourage obedience to the law. We decline to interpret this rule as speaking to conduct tending to embarrass the bar."). Thus, for example, in In re Discipline of Kerr, 86 Wash.2d 655, 548 P.2d 297 (1976) an attorney was disciplined for attempted subornation of perjury as an act of moral turpitude, which indeed reflects a disregard for the rule of law.
The majority, however, ignores that part of the text of RLD 1.1 which expressly references "disregard for the rule of law." And it abandons our rules altogether by following a medical discipline case, Haley v. Medical Disciplinary Bd., 117 Wash.2d 720, 742, 818 P.2d 1062 (1991), which rests on a rule wholly inapplicable even on its face to the legal *834 profession. The rule there at issue applied only to health professionals, not attorneys, and does not qualify that the act must indicate a "disregard for the rule of law."[5]
However much one may frown on Heard's alleged act of attorney-client sex under these circumstances, it simply does not "reflect[] disregard for the rule of law," and there is no claim to the contrary. The alleged sex was consensual between adults and completely lawful. If the complainant was marginally mentally impaired due to her injuries, there is no finding that impairment rendered her incompetent to consent to sexual intercourse. As a matter of fact the examiner specifically found "no guardian was ever appointed for Katrina Menz," CP at 153 (Findings of Fact, ¶ 14); whereas, the guardian ad litem was appointed narrowly for the litigation, not generally for the person.
Requiring proof of the necessary relationship between moral turpitude and disregard for the rule of law also sets a clearer standard, is more capable of prediction and provides fairer notice to the practitioner than the ad hoc, post hoc pronouncements of the majority.
If, as many believe, any sex outside marriage is evidence of "moral turpitude," as are many deviations from the heterosexual norm also so considered, the majority lacks any principled basis to limit its moral insight to sex merely with clients. Indeed, the clear language of the rule ("whether the same be committed in the course of his or her conduct as a lawyer ....") dispels any such limitation by its text, and I can see no practical reason to limit this holding in practice beyond those objections I previously stated. If it is our duty to uplift the moral character of our fellow practitioners in all respects, we certainly have our work cut out. This rule, as the majority construes it, has no limits. Nor has it rudder or anchor, but plenty of sail to get us out to sea.
DOLLIVER, J., concurs.
NOTES
[1] DSHS has a lien against any recovery by a recipient of public medical benefits against a tortfeasor. RCW 74.09.180; RCW 43.20B.060. DSHS may compromise the amount of the lien with the recipient. RCW 43.20B.050. DSHS must share in the legal fees and expenses incurred by the recipient to obtain a recovery against the tortfeasor:

(4) If recovery is made by the department under this section and the subrogation is fully or partially satisfied through an action brought by or on behalf of the recipient, the amount paid to the department shall bear its proportionate share of attorneys' fees and costs.
(a) The determination of the proportionate share to be borne by the department shall be based upon:
(i) The fees and costs approved by the court in which the action was initiated; or
(ii) The written agreement between the attorney and client which establishes fees and costs when fees and costs are not addressed by the court.
(b) When fees and costs have been approved by a court, after notice to the department, the department shall have the right to be heard on the matter of attorneys' fees and costs or its proportionate share.
(c) When fees and costs have not been addressed by the court, the department shall receive at the time of settlement a copy of the written agreement between the attorney and client which establishes fees and costs and may request and examine documentation of fees and costs associated with the case. The department may bring an action in superior court to void a settlement if it believes the attorneys' calculation of its proportionate share of fees and costs is inconsistent with the written agreement between the attorney and client which establishes fees and costs or if the fees and costs associated with the case are exorbitant in relation to cases of a similar nature.
RCW 43.20B.060(4).
[2] In seeking the appointment of a guardian ad litem, Heard's petition asserted Menz "is incompetent due to severe head injuries suffered in a motorcycle accident which occurred on August 27, 1989. She is now in a disabled condition, confined to hospital, and incapable of caring for herself or her affairs." Ex. 16 A at 1. Similarly, the guardianship petition stated:

The incompetent person is conscious but totally unable to function on her own. The injuries suffered in the motorcycle accident of August 27, 1989, make her totally dependent upon medical care in order to survive. It is unclear when, if ever, she will be able to survive without round-the-clock medical care.
Id. at 3.
[3] Heard does not deny this sequence of events. However, due to his intoxication that night, he does not recall if he had sexual relations with Menz. Report of Proceedings at 231.
[4] The Board here specifically struck the hearing examiner's decision because it "did not comport with the law or evidence presented, and the purpose of lawyer discipline." Clerk's Papers 216. We give greater weight to the Board's conclusions than to those of the hearing examiner. In re Disciplinary Proceeding Against Johnson, 118 Wash.2d 693, 703, 826 P.2d 186 (1992); Lynch, 114 Wash.2d at 607, 789 P.2d 752.
[5] However, the Board also noted that Heard never verified the value of the car. Clerk's Papers at 221 (Finding of Fact 34). Only the fair market value of property received may be included in the value of the settlement for purposes of calculating the contingent fee thereof. See Robert L. Rossi, Attorneys' Fees § 2:13, at 124 (2d ed. 1995) (where a client receives property rather than cash in settlement "the attorney is entitled to his contingent fee percentage of the fair or market value of the property." (Footnotes omitted.)). Giving the Mazda a $15,000 value appears to have been improper as Heard may well have set the numbers of the settlement unnaturally high so as to maximize his fee. The 1990 Blue Book for used car prices lists a 1987 Mazda RX7 as having a base average resale price, in 1990 when the settlement was reached, of between $8,375 and $10,400. N.A.D.A. Official Used Car Guide at 99 (Dec. 1990). Heard should have had the car appraised and should have included only the fair value thereof into the total value of the settlement.
[6] Count II alleged Heard did not have a written contingent fee agreement with Menz. The Board properly rejected this count as Menz's mother signed a written fee agreement on her behalf and Menz generally understood her fee agreement with Heard.
[7] Although no criminal conviction is present in this case, such conviction is not a prerequisite for a finding that Heard's actions amounted to moral turpitude. See RLD 1.1(a) ("... and if the act constitutes a felony or misdemeanor, conviction thereof in a criminal proceeding shall not be a condition precedent to disciplinary action, ..."). In Hopkins, addressing whether an action involves moral turpitude, we noted:

That question, after all, must be determined from the inherent immoral nature of the act, rather than from the degree of punishment which the statute law imposes therefor, though the latter may be some indication of the public conscience relating thereto.
Hopkins, 54 Wash. at 572, 103 P. 805.
[8] Iowa Code of Professional Responsibility for Lawyers EC 5-25 (1998); Minnesota Rules of Professional Conduct Rule 1.8(k) (1997); Oregon Code of Professional Responsibility DR 5-110(A) (1998); Wisconsin Rules of Professional Conduct SCR 20:1.8(k)(2) (1998); Rules of Professional Conduct of the State Bar of California Rule 3-120 (1998); Florida Rules of Professional Conduct Rule 4-8.4(i) (1998); New York Code of Professional Responsibility DR 1-102(A)(7) (1994).
[9] By our opinion, however, we do not announce a general rule regarding attorney-client sexual conduct. This issue may be addressed in the normal course of the judicial rulemaking or decisionmaking process. However, where an attorney so blatantly misuses his professional status to exploit a client's vulnerability, the Board is entirely justified in finding the conduct to be an act of moral turpitude under RLD 1.1.
[10] We have not however shied away from imposing disbarment for misuse of client funds where circumstances warrant. See, e.g., In re Disciplinary Proceeding Against Petersen, 120 Wash.2d 833, 846 P.2d 1330 (1993); In re Disciplinary Proceeding Against McGough, 115 Wash.2d 1, 793 P.2d 430 (1990); In re Disciplinary Proceeding Against Johnson, 114 Wash.2d 737, 790 P.2d 1227 (1990); In re Disciplinary Proceeding Against Rentel, 107 Wash.2d 276, 729 P.2d 615 (1986); In re Disciplinary Proceeding Against Rosellini, 97 Wash.2d 373, 646 P.2d 122 (1982) (listing pre-ABA Standards cases in which trust account violations have led to disbarment). Cf. In re Disciplinary Proceeding Against McLendon, 120 Wash.2d 761, 845 P.2d 1006 (1993) (imposing two-year suspension, rather than disbarment, for conversion of client funds in light of "extraordinary mitigating circumstance" of attorney's suffering from bipolar disorder during all relevant times and subsequent recovery through treatment).
[1] Attorney Ed Lane.
[2] The majority also cites In re Discipline of Lynch, 114 Wash.2d 598, 789 P.2d 752 (1990) for the proposition the Disciplinary Board may strike the factual findings of the hearing examiner and substitute its own. Majority at 823. However, Lynch does not recognize such broad authority in the Board. There the Board took additional evidence on administrative appeal, entering two new findings of fact based on new evidence, and also struck one finding of fact which was irrelevant. Id. at 608, 789 P.2d 752. We affirmed the Board because the two added findings were based on additional evidence taken directly by the Board, agreeing with the conclusion that the stricken finding was indeed irrelevant. Thus, while Lynch may be understood to allow the Board in certain cases to make additional findings based on new evidence and strike entered findings which are irrelevant, it does not allow the Board to simply ignore all the examiner's findings and replace those with new ones based on the same evidence previously considered by the examiner. But in the case now before us the Board did not take additional evidence nor were the findings stricken by the Board even claimed to be irrelevantadmittedly they went to the heart of the case.
[3] See also Sanders v. Gore, 676 So.2d 866, 872-73 (La.App.1996) ("Ms. Sanders also alleges an abuse of the attorney/client relationship. Although this court finds Mr. Gore's actions ethically reprehensible, Louisiana law does not prohibit sexual relationships between attorneys and their clients.").
[4] In State v. Bash, 130 Wash.2d 594, 606-07, 925 P.2d 978 (1996), we explained:

An associated principle is that crimes which involve moral turpitude are malum in se and have been held to require a mental element, some level of "guilty knowledge," even if the statute does not specify that element. State v. Turner, 78 Wash.2d 276, 280, 474 P.2d 91, 41 A.L.R.3d 493 (1970). In contrast, statutory crimes which are mala prohibita, if properly enacted within the police power, are often upheld without proof of an evil intent, and even without any mental element at all. Id. at 280, 474 P.2d 91.
[5] RCW 18.130.180, the rule governing health professionals, provides:

The following conduct, acts, or conditions constitute unprofessional conduct for any license holder or applicant under the jurisdiction of this chapter:
(1) The commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession, whether the act constitutes a crime or not.